334 P.2d 442

Roy F. ANSBAUGH, Claimant-Respondent,

v.

POTLATCH FORESTS, INC., Employer, and Workmen's Compensation Exchange, Surety, Defendants-Appellants.

No. 8683.

Supreme Court of Idaho.

Jan. 14, 1959.

Rehearing Denied Feb. 2, 1959.

Leslie T. McCarthy, Lewiston, for respondent.

Blake & Givens, Lewiston, for appellants.

**McQUADE, Justice**

This appeal is taken from an award of compensation to the claimant, Roy F. Ansbaugh. The assignments of error which will be disposed of on appeal are: 1. That claimant did not receive any injury in the course of and arising out of his employment for Potlatch Forests, Inc.; 2. The Industrial Accident Board erred in finding that the delay in giving notice as soon as practicable did not prejudice the defendants, and that the defendants would be permitted to show upon further hearing the nature and extent of the prejudice suffered by the delay; 3. The Board erred in permitting Burton R. Stein, M. D., to testify as to his opinion based in part upon history related to him by claimant when the purpose of his examination was to enable him to testify as a medical expert for the claimant; 4. The Board erred in its decision in that the facts found by the Board do not as a matter of law justify the conclusion reached.

Claimant was in his sixty-second year the night of the alleged injury, March 15, 1957, and had been an employee of Potlatch Forests, Inc., for many years.

Four weeks prior thereto, and on March 15, his duties were those of a spotter and checker on the night shift in the rough storage sheds. He had been doing this same class of work on the day shift for about two years. Generally his duties consisted of throwing blocks of wood measuring five by five by 52 inches, weighing from 18 to 28 pounds, onto loads of lumber; he lifted normally 400 to 500 such blocks during the shift from 5 p. m. to 2 a. m. In addition to loading and unloading blocks, the claimant's duties required him to push empty lumber buggies into position for loading. These buggies actually are wooden flat beds mounted on heavy iron axles and small solid iron wheels, and run on iron rails. From photographs, these carts appear to be about three feet in width and not to exceed five feet in length.

During the last four weeks of Ansbaugh's employment on the night shift he was both spotting and checking, a combined job, which before that time had been segregated. The change was a part of the reduction of force made by the management incident to curtailed production. A number of workers, including claimant, through their local labor union, joined in filing a grievance, contending that each worker retained had to do two men's work, and raising an issue between the union and the company. It appears that the workers were unsuccess-

ful in their efforts to have the company revert to the former practice.

Ansbaugh, whose work prior to the reduction of force had been on the day shift, testified he found the combined job difficult. Required to go from place to place, he said: "I just couldn't get around without an exceptional amount of fast work * * * I have even had to run to keep up." He also experienced pain in his left arm, which he attributed to "pulling on those blocks."

"Due to my height (5′4¼″) I would have to belly right up to the load and stand on my tiptoes and jump and get ahold of a five-by-five on top and pull it down."

Antedating March 15, 1957, the medical history of the claimant was set out in the Board's findings of fact as follows:

"Some seven or eight years ago, claimant had two surgical operations, one for a hernia and the other for hemorrhoids * * *.

"From January 5 to March 22, 1955, Ansbaugh was treated with antibiotics by Dr. George A. Thompson for cough and chest pain. No diagnosis of his then malady appears in the record. The doctor encouraged him to give up smoking and the patient told him that he had. * * *

"Ansbaugh described his pain at that time as pleurisy pains * * *. He was told he had a spot on his lung * * *. It was a stabbing type of pain * * *. He felt it at times on the right side, at times on the left * * * sometimes in the back * *. He had experienced such pain for as long as six years * * *."

Dr. Burton R. Stein, an internist who examined the claimant and was called as a witness for him, testified it was his opinion Ansbaugh suffered coronary atherosclerosis prior to March 15. He testified in part:

"* * * As a rule this coronary artery trouble, coronary atherosclerosis precedes by considerable years the clot or the infarct. That is not a steadfast rule, but it is true in the vast majority of patients.

"* * * I very seriously doubt he would have experienced the myocardial infarction without a coronary atherosclerotic condition."

Claimant testified as follows concerning the circumstances which he alleges brought on his injury:

"Q. You stated the 15th of March —was there anything unusual that took place on that particular day in connection with your work? A. Well between six and seven o'clock that evening—now I had, I would say four— possibly five—little attacks. I call them attacks, they really weren't attacks but

I had angina pain. I had that several times. I didn't know what was wrong at the time.

"Q. When did the pain come on? A. The first one I noticed, and the worst one, I was shoving two buggies out of shed one.

"Q. What date was this, rather— what time was it? A. That was between six and seven on the 15th of March—I don't know exactly what the time was.

"Q. What had you been doing prior to that time? A. Well we was probably piling lumber—I don't remember just what was going on, whether we were piling lumber from the unstacker. I don't know whether it was the first or second drag into the plant.

"Q. You said you had angina pain —what were you doing at the time? A. In pushing the buggies from shed one to two, sometimes that pushing is pretty dog-goned hard, and one wheel—the wheel nearest to me, I was really pushing on it, there was a bar in there against the buggy—it was kind of dragging and I was pushing harder than I ever pushed. One wheel was barely turning, barely going. It would turn for a little while and stick, and then turn again. I had to put my back to the buggy to lift up on it to keep my feet from slipping out from under me. As soon as I got the buggy to where the crane operator could reach it, I had to sit down on a buggy —that's when the pain hit me—as soon as I quit pushing. I sat down and I couldn't keep my breath coming fast enough. I don't know what happened. I sat there, I would say possibly thirty seconds or forty seconds until this pain had just started slowly going away and I got my breath and felt normal again.

"Q. Had you ever, at any time in your entire life, experienced pain such as you experienced then? A. I never did."

He went to bed at 2:30 in the morning without further distress, but on awakening around 6 or 7 he had a severe pain which he characterized as "angina pain— terrific." His wife called George A. Thompson, M. D., who caused claimant to be placed in a hospital for treatment which extended over a period of 16 days to the thirty-first of March. Thompson diagnosed the ailment as myocardial infarction. Ansbaugh was further examined and treated by Burton R. Stein, M. D., at the instance of the claimant's attorney and Thompson. Stein also found as a result of examination and an electrocardiogram that Ansbaugh had suffered a myocardial infarction.

Stein examined and treated Ansbaugh from June 24, 1957, through October 23,

1957. In addition, Stein rendered a consultant's report to Thompson, who concluded that Ansbaugh should remain a patient of Stein after September 18. This witness further testified:

"The induction of pain the previous evening, with relatively slight effort, tells me there has been an abrupt change in his coronary circulation, and it is not inevitable he would have had the myocardial infarction the next morning, but it is probable he would have experienced it within the near future."

Dr. Russell B. Hanford, a specialist in internal medicine, examined Ansbaugh November 25, 1957, for the defendants. He testified in his opinion the claimant suffered a coronary occlusion and myocardial infarction, the latter occurring March 16. Symptoms the previous evening were preliminary to it, Dr. Hanford testified, but in his opinion the infarction was not incident to the work Ansbaugh was doing. He testified the underlying process which led to claimant's illness was a degenerative arterial process seen in all males of his age, or even earlier. This sequence of events, he explained, is caused by formation of a small blood clot.

Medical and hospital coverage were largely paid for by the North Idaho District Medical Service Bureau. The labor union and Potlatch Forests, Inc., had an agreement whereby a group insurance policy was obtained for the purpose of securing benefits to workers on account of illness or accidents. These benefits were $40 per week for non-occupational disability and $20 per week for occupational disability, payable for a maximum period of 26 weeks. Ansbaugh applied for and secured benefits under this policy for a non-occupational injury, and received $40 per week for a period of 23 weeks and three days. On this claim Thompson, M. D., stated the injury was "myocardial infarction," probably incident to work. Claimant stated the injury was attributable to "extra work." Written claim for Workmen's Compensation was filed with the Industrial Accident Board September 9, 1957; and the compensation carrier denied liability on the grounds that notice had not been given as provided by law, and further that the injury was not caused by an accident arising out of and in the course of employment, as would be allowable under our Workmen's Compensation statutes.

The Industrial Accident Board found from the evidence that Ansbaugh received a personal injury caused by an accident arising out of and in the course of his covered employment by Potlatch Forests, Inc.; that claimant had a pre-existing infirmity, to wit, arteriosclerosis; that this pre-existing condition was the primary cause of the myocardial infarction which was precipitated by his physical exertions related to his employment.

Appellants assign as error the finding of the Board that the delay in giving of notice as soon as practicable did not prejudice the defendants and that the defendants would be permitted to show upon further hearing the nature and extent of the prejudice suffered by delay.

Claimant contends the employer had notice of the accident and was not prejudiced by the delay, whereas the defendants argue that they did not have knowledge of the accident, and the burden of proving both the knowledge of the accident or the lack of prejudice rests upon the employe. In urging that Potlatch Forests, Inc., had notice of the injury, the claimant relies upon the filing of the claim for accident and health benefits under the group insurance policy with the employer, and further that in this claim for benefits his physician answered question three as follows:

"3. Is present disability due to patient's occupation? Probably incident to work."

There was a question answered thereon by the employer as follows:

"6. If occupational disability and claimant received Workmen's Compensation have benefits stopped? Denied by W. C. E. [Workmen's Compensation Exchange] On what date? Reason No accident reported."

The claimant answered another question thus:

extra work
"2. If disability is due to accident: Where? Rgh Storage P. F. I. When? 3–15–57 Describe A grievance served due to work is still in process before injury will explain."

The word "accident" had been crossed out on the form and the words "extra work" written in its place.

The grievance suggested by Ansbaugh was reported March 5, 1957, and the following is the report:

"Grievance Report

"Mill or Camp Clearwater Mill Department Rough Storage Date Mar. 5, 1957

"All grievances reduced to writing must be submitted within five working days of the date of the grievance.

"Grievance: On or about Feb. 11, 1957, two spotters were taken off on night shift as well as one locy crew being taken off Feb. 18, 1957. The Union feels these men should be put back on the job as the above condition makes more work for the rest of the crew.

"Roy Ansbaugh
"Shop Steward or Aggrieved Employee"

When the Potlatch Forests, Inc., clerk in charge of the group health insurance policy received the claim for insurance benefits, he contacted the Workmen's Compensation section, checked with the first

aid department, and, finally, talked with Dr. Thompson. There was no notice filed with the company's Workmen's Compensation department, there was no first aid report, and the following is the clerk's conclusion of that call:

"* * * I * * * talked to Dr. Thompson and the statements made by Dr. Thompson were enough to indicate to me that the grievance was not strong enough to merit an occupational claim and that I could go ahead."

■ Workmen's Compensation is not payable for a disability caused by any occupational disease other than as set out in the occupational disease compensation law, I.C. Title 72, part 2, particularly in I. C. sec. 72–1204.

■ An occupational disability, caused by an occupational infliction, may come about without any incident of accident; such is the import of respondent's claim for health benefits under the group insurance, inasmuch as he claimed occupational disability "due to extra work" without reporting any accident, but specifically avoided any theory of accident by crossing that word from the group insurance form, and substituting the words "extra work."

Such a notice is not sufficient to apprize appellant employer of any accident arising out of and in the course of employment causing personal injury, as contemplated by I.C. sec. 72–402, under the Workmen's Compensation Law, I.C. Title 72, part 1.

The fact that claimant "felt that the injury was occupational" is insufficient notice of any claimed accident allegedly resulting in a compensation covered injury; and though the disability be from an occupational cause, such a disability is not compensable if not covered by I.C. sec. 72–1204.

■ Where an employe asserts that he has received a personal injury caused by an accident arising out of and in the course of his employment, I.C. sec. 72–201, and seeks compensation for the injury, he shall give notice of the accident to his employer as soon as practicable but not later than 60 days after the happening thereof. I.C. sec. 72–405 provides that want or delay in giving such notice shall not be a bar to proceedings for compensation if it be shown that the employer had knowledge of the accident, or that the employer has not been prejudiced by such delay or want of notice.

■ The burden of proof is on a claimant who has not given, or who has delayed giving, notice of the accident, to show that no prejudice resulted to the employer on account of such want of, or delay in, giving notice. Claimant's failure to discharge the statutory obligation of proving that the appellants were not prejudiced by the failure to give notice or that they had knowledge of an accident is a com-

**524**

plete bar to an award of compensation. Bodah v. Coeur D'Alene Mill Co., 44 Idaho 680, 258 P. 1079; Wilson v. Standard Oil Co., 47 Idaho 208, 273 P. 758; Frost v. Idaho Gold Dredging Co., 54 Idaho 312, 31 P.2d 270; Long v. Brown, 64 Idaho 39, 128 P.2d 754; Lescinski v. Potlatch Forests, 67 Idaho 98, 170 P.2d 605.

■ "As soon as practicable," in relation to the giving of notice, means that "it must be reasonable taking into consideration all the circumstances of the particular case." Frost v. Idaho Gold Dredging Co., supra [54 Idaho 312, 31 P.2d 272].

The notice in writing under the group insurance policy is specific notice to the employer that the claimant did not have an accident, and he received payment under the group insurance policy because he did not have an industrial accident.

Respondent claimed benefits under the group insurance policy on the theory of a non-occupational injury, and on that basis was allowed the greater benefits of $40 per week by the insurance carrier. After a period of almost six months, the respondent changed his position, and now seeks to recover under the Workmen's Compensation Act for an industrial injury.

■ Claimant made a claim for an injury that was not connected with his employment. Before he can now claim that the injury was compensable under the Workmen's Compensation Act the claimant is required to adduce evidence which would substantiate a reversal of the former statement.

The first position has resulted in a material detriment to the appellants, and the claimant cannot be permitted capriciously to change from one theory to another.

Any mistake in theory as to the causative factor for the alleged injury would be a unilateral mistake of the claimant, and therefore required persuasive evidence to permit the adoption of a new theory of his substantive rights under the other facts established.

The award of the Industrial Accident Board is reversed and the cause remanded with directions to enter an order denying an award to respondent.

Costs to appellants.

PORTER, C. J., and TAYLOR and SMITH, JJ., concur.

KEETON, C. J., concurred in this opinion prior to his retirement.